[Cite as *State v. Brown*, 2020-Ohio-3614.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,            CASE NO. 1-19-61

    v.

TAYVON BROWN,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Allen County Common Pleas Court
Trial Court No. CR 2018 0227

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

Date of Decision: July 6, 2020

APPEARANCES:

    *Andrea M. Brown* **for Appellant**

    *Jana E. Emerick* **for Appellee**

**PRESTON, J.**

{¶1} Defendant-appellant, Tayvon J. Brown ("Brown"), appeals the September 18, 2019 judgment of conviction and sentence of the Allen County Court of Common Pleas. For the reasons that follow, we affirm in part and reverse in part.

{¶2} On December 16, 2017, an officer from the Lima Police Department responded to a call about a traffic accident on the north side of the city of Lima. On arrival, the officer observed Keaireus Fuqua ("Fuqua") and a small child walking toward a disabled vehicle. When the officer approached Fuqua, he noticed that her lips and the area around her mouth were smeared with blood. The officer asked Fuqua what caused the bleeding, and she responded by telling the officer that she was pregnant and exclaiming, "[H]e never should have put his hands on [her]." After additional questioning, Fuqua stated that Brown, her romantic partner, caused the injuries to her face. Fuqua was then taken to the hospital where she made further statements implicating Brown in an assault against her.

{¶3} On June 13, 2018, the Allen County Grand Jury indicted Brown on one count of domestic violence in violation of R.C. 2919.25(A), (D)(5), a fifth-degree felony. (Doc. No. 4). The indictment specifically alleged that Brown knew that Fuqua was pregnant at the time of the violation. (Id.). On June 25, 2018, Brown appeared for arraignment and pleaded not guilty to the count of the indictment. (Doc. No. 22).

{¶4} On December 13, 2018, the State filed a motion for the trial court to call Fuqua as the court's witness pursuant to Evid.R. 614(A). (Doc. No. 80). As grounds for its motion, the State argued that it had reason to believe that Fuqua's trial testimony would "contradict a prior statement made to police." (*Id.*).

{¶5} A jury trial commenced on December 17, 2018. At the beginning of the trial, the State renewed its motion for the trial court to call Fuqua as the court's witness. (Dec. 17-18, 2018 Tr. at 21). The trial court granted the State's motion without objection. (*Id.* at 22). In addition, Brown twice moved for a judgment of acquittal under Crim.R. 29. (*Id.* at 157, 185-186). The trial court denied both of Brown's Crim.R. 29 motions. (*Id.* at 162, 186). On December 18, 2018, the jury found Brown guilty of domestic violence. (Doc. Nos. 94, 95). However, the jury found that the State did not prove beyond a reasonable doubt that Brown knew that Fuqua was pregnant at the time of the offense. (Doc. No. 94). Consequently, Brown was found guilty of first-degree misdemeanor domestic violence rather than fifth-degree felony domestic violence as charged in the indictment. (Doc. No. 95).

{¶6} The trial court proceeded immediately to sentencing. The trial court sentenced Brown to 180 days in the Allen County Jail—80 days of which the trial court suspended. (Doc. No. 95). The trial court did not award Brown any jail-time credit. (*See* Dec. 17-18, 2018 Tr. at 247). In addition, Brown was placed on "community control/probation" for a period of two years and ordered to pay a $1000

fine. (Doc. No. 95). The trial court's judgment entry of conviction and sentence was filed on December 19, 2018. (*Id.*).

{¶7} On January 2, 2019, Brown filed a notice of appeal from the trial court's December 19, 2018 judgment. (Doc. No. 98). On September 3, 2019, this court dismissed Brown's appeal for lack of a final, appealable order. (Doc. No. 119). Specifically, we concluded that because Brown was sentenced to a term of local incarceration in jail for a misdemeanor offense, the trial court was required to calculate Brown's jail-time credit under R.C. 2949.08, and we noted that the trial court failed to include a calculation of Brown's jail-time credit in its judgment entry of conviction and sentence. (*Id.*). Accordingly, we dismissed Brown's appeal "for the trial court to file a proper and complete sentencing entry." (*Id.*).

{¶8} On September 18, 2019, the trial court filed an amended judgment entry of conviction and sentence in which it stated that it was giving Brown "no credit for time previously served prior to the sentencing date as the jail time imposed was a condition of community control." (Doc. No. 120).

{¶9} On October 7, 2019, Brown filed a notice of appeal from the trial court's September 18, 2019 judgment. (Doc. No. 122). He raises five assignments of error for our review. We address Brown's assignments of error in the order presented, but, for the sake of clarity, we consider Brown's second and third assignments of error together.

## Assignment of Error No. I

**The trial court's improper admission of hearsay statements constituted plain error and deprived defendant-appellant of his right to a fair trial.**

{¶10} In his first assignment of error, Brown argues that the trial court committed plain error by allowing the admission of several hearsay statements at his trial. He maintains that the record "is replete with several out-of-court statements made by the victim, Ms. Fuqua, and admitted at trial in which [he] was identified as the alleged assailant" and that "[b]ut for the trial court's error in allowing the hearsay statements into evidence, the outcome of [his] jury trial would have been much different." (Appellant's Brief at 9). Specifically, Brown takes issue with hearsay contained in the testimony of the officer who initially responded to Fuqua's traffic accident, Patrolman Nathan Fried ("Patrolman Fried"), in the testimony of an emergency room nurse at St. Rita's Medical Center ("St. Rita's") who met with Fuqua on December 16, 2017, Ronda Norris ("Norris"), and in State's Exhibit 15, which are medical records from Fuqua's visit to the emergency room at St. Rita's on December 16, 2017. (*Id.*).

{¶11} "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). *See HSBC Bank U.S.A., Natl. Assn. v. Gill*, 1st Dist. Hamilton No. C-180404, 2019-Ohio-2814, ¶ 6-10 (documenting a

split between courts of appeals concerning the proper standard of review to apply when reviewing the admission of hearsay but concluding that *McKelton* and other Supreme Court decisions dictate abuse-of-discretion review). However, as Brown recognizes, because he failed to object to the admission of the hearsay contained in Patrolman Fried's and Norris's testimonies and in State's Exhibit 15, we review for plain error. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 72, citing *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, ¶ 66.

{¶12} We recognize plain error "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *State v. Landrum*, 53 Ohio St.3d 107, 111 (1990), quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. For plain error to apply, the trial court must have deviated from a legal rule, the error must have been an obvious defect in the proceeding, and the error must have affected a substantial right. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Under the plain error standard, the appellant must demonstrate that the outcome of his trial would clearly have been different but for the trial court's errors. *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), citing *State v. Moreland*, 50 Ohio St.3d 58 (1990).

{¶13} Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay is not admissible

unless an exception applies. Evid.R. 802. "'Evid.R. 803 is one such rule which permits the admission of certain hearsay statements even though the declarant is available as a witness.'" *State v. Bender*, 3d Dist. Union No. 14-19-22, 2020-Ohio-722, ¶ 12, quoting *Dayton v. Combs*, 94 Ohio App.3d 291, 300 (2d Dist.1993). Three of these exceptions—Evid.R. 803(2), Evid.R. 803(4), and Evid.R. 803(6)—potentially apply to the hearsay admitted in the present case.

{¶14} We begin with Patrolman Fried's testimony and the first of the arguably applicable exceptions to the hearsay rule—Evid.R. 803(2), which allows for the admission of excited utterances. At trial, Patrolman Fried testified that on the morning of December 16, 2017, he was dispatched to the six-hundred block of West Northern Avenue in Lima to respond to a report of a traffic accident with no injuries. (Dec. 17-18, 2018 Tr. at 30-31). He stated that he arrived in the area approximately 10-12 minutes after the Lima Police Department was first contacted about the accident. (*Id.* at 31). Patrolman Fried testified that when he arrived at the scene, he observed a woman and a young boy walking toward a vehicle that was "facing the wrong way into traffic" and resting alongside the curb. (*Id.* at 32-33). He stated that the woman identified herself as Fuqua and that he was able to establish that she had been driving the vehicle. (*Id.* at 33-34).

{¶15} Patrolman Fried testified that when he approached Fuqua, "[s]he had blood on her mouth * * * [and] seemed very emotional, very distraught." (*Id.* at

-7-

34). Patrolman Fried stated that he "asked her what happened and she stated that [she was] pregnant and 'he never should have put his hands on me.'" (*Id.*). He testified that he then asked Fuqua who had put their hands on her, and she responded that it was Brown. (*Id.* at 34-35). Finally, Patrolman Fried said that he "asked [Fuqua] how she had received the injury and she said it was from [Brown]." (*Id.* at 35).

{¶16} The State argues that Fuqua's statements to Patrolman Fried regarding the blood on her mouth and the identity of her assailant were admissible as excited utterances pursuant to Evid.R. 803(2). Under Evid.R. 803(2), "statement[s] relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" are excepted from the hearsay rule. In determining whether a statement is admissible under Evid.R. 803(2), the Supreme Court of Ohio has applied the following four-part test:

(a)  that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective,

(b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,

(c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and

(d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

(Emphasis sic.) *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 166, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

{¶17} "'When evaluating statements under this test, "[t]here is no per se amount of time after which a statement can no longer be considered to be an excited utterance."'" *State v. Baskin*, 3d Dist. Allen No. 1-18-23, 2019-Ohio-2071, ¶ 61, quoting *State v. Little*, 3d Dist. Allen No. 1-16-29, 2016-Ohio-8398, ¶ 11, quoting *State v. Taylor*, 66 Ohio St.3d 295, 303 (1993). "'Rather, "each case must be decided on its own circumstances."'" *Id.*, quoting *Little* at ¶ 11, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219 (1978). "'"The central requirements are that the statement must be made while the declarant is still under the stress of the event and

the statement may not be a result of reflective thought.""" *Id.*, quoting *Little* at ¶ 11, quoting *Taylor* at 303. "Further, 'the admission of a declaration as an excited utterance is not precluded by questioning which: (1) is neither coercive nor leading, (2) facilitates the declarant's expression of what is already the natural focus of the declarant's thoughts, and (3) does not destroy the domination of the nervous excitement over the declarant's reflective faculties.'" *State v. Whitfield*, 1st Dist. Hamilton No. C-020241, 2002-Ohio-5984, ¶ 6, quoting *State v. Wallace*, 37 Ohio St.3d 87, 93 (1988).

{¶18} We conclude that Fuqua's statements to Patrolman Fried were admissible as excited utterances under Evid.R. 803(2). First, there is no question that the event to which Fuqua's statements referred—an assault perpetrated by the man she was dating—was startling enough to produce a nervous excitement in Fuqua and impair her reflective faculties. *See State v. Boss*, 5th Dist. Ashland No. 16-COA-026, 2017-Ohio-697, ¶ 24; *Cleveland v. Williams*, 8th Dist. Cuyahoga No. 101588, 2015-Ohio-1739, ¶ 5-6, 18-20. Furthermore, Fuqua's statements related to the assault, and as the victim, Fuqua observed personally the matters asserted in her statements. In addition, although Fuqua's statements were made in response to Patrolman Fried's questions and were thus not unprompted, Patrolman Fried's questioning was not coercive or leading; instead, it was open-ended and allowed

Fuqua to express what was already on her mind without overcoming the excitement produced by the assault. *See Whitfield* at ¶ 8-9. (*See* State's Ex. 2).

{¶19} Brown does not dispute that Fuqua's statements to Patrolman Fried meet most of the criteria for admissibility as excited utterances. However, he contends that Fuqua did not make the statements to Patrolman Fried while under the stress of the excitement of the attack because "she had just been in a motor vehicle accident where she ran her car up over a curb after leaving her residence to follow Brown in her car." (Appellant's Reply Brief at 1-2). Brown acknowledges that Fuqua was "very upset," "very emotional," and "very distraught" when she spoke to Patrolman Fried, but he notes that there was no testimony "pinpointing that Ms. Fuqua was still under the stress/excitement of the startling event * * * as opposed to the fact that she had just ran her car up over a curb with her son in the vehicle." (*Id.* at 2). He maintains that the accident was an "intervening circumstance * * * [that] could have influenced her statements to Patrolman Fried" and suggests that her statements were made in response to the stress of the accident rather than the stress of the assault. (*Id.* at 1-2).

{¶20} We disagree. In this case, there was little evidence concerning when the accident occurred in relation to the assault. In her testimony, Fuqua could not recall when she and Brown got into the altercation, other than that it happened after they woke up on the morning of December 16, 2017. (Dec. 17-18, 2018 Tr. at 67-

68). She stated that, shortly after the incident, Brown left her apartment in a vehicle and that she then left her apartment and chased after him in her vehicle before running into the curb. (*Id.* at 71). Although there is nothing in the record regarding how much time elapsed between when Fuqua hit the curb and when the Lima Police Department was first contacted about the accident, Patrolman Fried testified that he arrived at the scene of the accident approximately 10-12 minutes after the call came in, and the video recording from the dashboard camera of Patrolman Fried's patrol vehicle reflects that Patrolman Fried initiated contact with Fuqua at approximately 10:50 a.m. (*Id.* at 31); (State's Ex. 2). Thus, although the time between the assault and Fuqua's statements cannot be determined with absolute certainty, the evidence strongly suggests that the statements were made close enough in time to the assault that Fuqua was still suffering from the original stress of the attack.

{¶21} Moreover, while the accident was "intervening" in the sense that it occurred between the attack and Fuqua's statements, it was not an isolated incident that severed the connection between the assault and Fuqua's statements. When Fuqua crashed her vehicle, she was in pursuit of the man who had recently attacked her. If anything, the traffic accident served to maintain, or even amplify, the state of nervous excitement caused by the assault rather than diminish it. *See State v. Boyd*, 3d Dist. Hancock No. 5-89-23, 1990 WL 121491, *4 (Aug. 21, 1990) ("There was only one intervening circumstance noted in the evidence. [The assault victim]

was informed by the bartender that the house was on fire. This would tend to increase the stress already existing and would *not* eliminate it.") (Emphasis sic.). Therefore, the record leaves little doubt that Fuqua was under the influence of the stress caused by the assault when she made the statements to Patrolman Fried. Accordingly, we conclude that Fuqua's statements to Patrolman Fried are admissible as excited utterances under Evid.R. 803(2) and that the trial court did not plainly err by allowing Patrolman Fried to testify about those statements.

{¶22} Next, we turn to the hearsay embedded in Norris's testimony and in State's Exhibit 15. Most of Norris's testimony was directed toward explaining St. Rita's emergency department's regular procedures and the procedures that were followed during Fuqua's visit. Norris testified that in order to properly care for a person who comes into the emergency room, it is important to get as much information as possible from the person, specifically about what happened to the person and why they were admitted. (Dec. 17-18, 2018 Tr. at 116). She stated that patients will be asked "what brought them [to the emergency room] in order to better treat them appropriately." (*Id.*).

{¶23} Norris also testified that whenever medical personnel interact with a patient at the emergency room, a record is made of the interaction. (*Id.* at 118). She stated that information gathered from a patient is documented in the record at or around the time the patient gives the information, that the information is logged by

a person that talks to the patient or has knowledge of what the patient said, and that these records are kept and relied on in the ordinary course of business at St. Rita's. (*Id.* at 118-119). Norris testified that when Fuqua came to the emergency room at St. Rita's on December 16, 2017, a record of Fuqua's visit was created in accordance with these procedures. (*Id.* at 117, 119). Norris identified State's Exhibit 15 as a fair and accurate copy of Fuqua's medical records from St. Rita's. (*Id.* at 119); (State's Ex. 15).

{¶24} State's Exhibit 15 contains a number of statements made by Fuqua to the medical staff at St. Rita's on December 16, 2017. (State's Ex. 15). First, the medical record indicates that Fuqua told Dr. Sampath Medepalli that "she was in an altercation with her boyfriend," that "[h]e threw her on the ground and punched her in the face and then she turned on her abdomen and he punched her in the back," and that "[s]he had a nosebleed initially." (*Id.*). In addition, Nurse Ashley Scott recorded that Fuqua stated that "she got in a fight [with her] child's father" and that Fuqua "report[ed] [that] he was hitting her and slamming her." (*Id.*). Nurse Scott also reported that Fuqua stated that her "stomach [was] starting to hurt * * *." (*Id.*).

{¶25} Finally, at one point, Norris read from the notes of Dr. Medepalli and Nurse Scott contained in State's Exhibit 15. (Dec. 17-18, 2018 Tr. at 121, 123). In addition, Norris stated that when she spoke to Fuqua, Fuqua "agreed that she was not going back home to him." (*Id.* at 127). According to Norris, Fuqua "also agreed

that she was going to be going to the Prosecutor's Office on Monday to discuss getting a protection order." (*Id.*). Apart from this testimony, Norris did not testify to anything Fuqua said during her visit to St. Rita's on December 16, 2017.

{¶26} The State argues that Evid.R. 803(4) and 803(6) support the admission of Fuqua's out-of-court statements contained in Norris's testimony and in State's Exhibit 15. Evid.R. 803(4) excepts from the hearsay rule "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." "'The hearsay rules except statements made for the purpose of medical diagnosis or treatment due to the inherent reliability underlying the nature of those statements.'" *Bender*, 2020-Ohio-722, at ¶ 13, quoting *State v. Lykins*, 4th Dist. Adams No. 18CA1079, 2019-Ohio-3316, ¶ 94 and citing *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 39. "'[S]tatements made for the purpose of medical diagnosis and treatment are considered reliable because "'facts reliable enough to be relied on in reaching a diagnosis have sufficient trustworthiness to satisfy hearsay concerns.'"'" *Id.*, quoting *Lykins* at ¶ 95, quoting *State v. Dever*, 64 Ohio St.3d 401, 411 (1992), quoting McCormick, *Evidence*, Section 250 (4th Ed.1992), and citing *Muttart* at ¶ 41.

Case No. 1-19-61

{¶27} On the other hand, Evid.R. 803(6), commonly referred to as the business-records exception, exempts from the rule against hearsay:

A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

"Generally, authenticated medical records are admissible at trial." *State v. Schultz*, 8th Dist. Cuyahoga Nos. 102306 and 102307, 2015-Ohio-3909, ¶ 28, citing *Hunt v. Mayfield*, 65 Ohio App.3d 349, 352 (2d Dist.1989). "Although potentially replete with hearsay problems, medical records are admissible under the exception to the hearsay rule for records of regularly conducted activity set forth in Evid.R. 803(6)." *Id.*, citing *State v. Humphries*, 79 Ohio App.3d 589, 595 (12th Dist.1992).

-16-

{¶28} Because it presents more potential hearsay issues, we begin with the out-of-court statements contained in State's Exhibit 15. Brown does not argue that State's Exhibit 15 fails to satisfy the requirements of Evid.R. 803(6). (*See* Appellant's Brief at 9); (*See* Appellant's Reply Brief at 3). After reviewing Norris's testimony concerning St. Rita's regular procedures and the manner in which State's Exhibit 15 was prepared and kept, we are satisfied that even if some of the statements contained in State's Exhibit 15 are not admissible under Evid.R. 803(4), State's Exhibit 15 itself is admissible under Evid.R. 803(6). Moreover, Brown does not appear to dispute that Fuqua's statements to the staff at St. Rita's about her physical symptoms, i.e., a nosebleed and stomach pain, and the cause of those symptoms, i.e., being thrown on the ground, hit, punched, and slammed, were made for purposes of medical diagnosis or treatment and were reasonably pertinent to medical diagnosis or treatment. Therefore, Brown seems to concede that these statements are admissible under Evid.R. 803(4)—a concession with which we agree.

{¶29} However, Brown argues that the portions of Fuqua's statements in which she identified her attacker as her "boyfriend" or "child's father" are not admissible under Evid.R. 803(4) because "absent some evidence that the identity of a perpetrator is necessary for medical purposes, any statements identifying [him] as the assailant were not properly admitted pursuant to Evid.R. 803(4) * * *." (Appellant's Reply Brief at 3). Indeed, many courts have expressed their approval

of "the general rule 'that a statement as to the identity of the perpetrator of a criminal act, which is not reasonably related or necessary to medical diagnosis, is not admissible under Evid.R. 803(4).'" *State v. Dyer*, 11th Dist. Lake No. 2015-L-121, 2017-Ohio-426, ¶ 50, quoting *State v. Ashford*, 11th Dist. Trumbull No. 99-T-0015, 2001 WL 137595, *8 (Feb. 16, 2001). *See State v. McCluskey*, 4th Dist. Ross No. 17CA3604, 2018-Ohio-4859, ¶ 34; *State v. Kingery*, 12th Dist. Fayette No. CA2009-08-014, 2010-Ohio-1813, ¶ 34. Yet, in this case, we need not determine how or whether this general rule applies because the identifications in State's Exhibit 15 are cumulative to Fuqua's statements to Patrolman Fried in which she identified Brown as her assailant, and we have already determined that such statements are admissible under Evid.R. 803(2). *See Dyer* at ¶ 53. "Generally, where other admissible substantive evidence mirrors improper hearsay, the error in allowing the hearsay is deemed harmless, since it would not have changed the outcome of the trial." *State v. Williams*, 1st Dist. Hamilton No. C-160336, 2017-Ohio-8898, ¶ 17, citing *State v. Richcreek*, 196 Ohio App.3d 505, 2011-Ohio-4686, ¶ 43 (6th Dist.), citing *State v. Byrd*, 8th Dist. Cuyahoga No. 82145, 2003-Ohio-3958, ¶ 39. Therefore, even assuming error in the admission of the identifications in State's Exhibit 15, the error was harmless. *See id.*; *Dyer* at ¶ 53.

{¶30} Finally, with respect to Norris's testimony, we conclude that the trial court's error, if any, in allowing the admission of the hearsay in Norris's testimony

was harmless. In light of the admissible substantive evidence discussed above, including Fuqua's statements to Patrolman Fried that Brown caused her injuries and Fuqua's account of the attack that she related to Patrolman Fried and to the medical staff at St. Rita's, we cannot conclude that the outcome of the trial would have been different had Norris not been permitted to testify concerning Fuqua's statements about not going home with Brown or about seeking a civil protection order. Furthermore, Norris's reading of sections of State's Exhibit 15 was merely duplicative of the exhibit itself—much of which we have already concluded to be admissible.

{¶31} In sum, much of the hearsay to which Brown now objects is admissible under various exceptions to the rule against hearsay. To the extent that some of this hearsay might be inadmissible, the exclusion of this evidence would not have changed the outcome of Brown's trial. As a result, we conclude that the trial court did not commit plain error.

{¶32} Accordingly, Brown's first assignment of error is overruled.

**Assignment of Error No. II**

**The trial court erred in not granting defendant-appellant's motion for acquittal, pursuant to Crim.R. 29(A), due to insufficient evidence presented to support a conviction.**

**Assignment of Error No. III**

**The jury's verdict of guilty on the charge of domestic violence, a misdemeanor of the first degree, was not supported by**

**sufficient evidence and was against the manifest weight of the evidence.**

{¶33} In his second and third assignments of error, Brown argues that his domestic-violence conviction is not supported by sufficient evidence and that it is against the manifest weight of the evidence.

{¶34} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address each legal concept individually.

{¶35} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25

(1st Dist.). *See also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19 ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence."), citing *Thompkins* at 386. Because the purpose of a Crim.R. 29 motion for acquittal "is to test the sufficiency of the evidence presented at trial," we "review[] a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim." *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 9, citing *State v. Terry*, 12th Dist. Fayette No. CA2001-07-012, 2002-Ohio-4378, ¶ 9, citing *State v. Williams*, 74 Ohio St.3d 569, 576 (1996); *State v. Lightner*, 3d Dist. Hardin No. 6-08-11, 2009-Ohio-544, ¶ 11, citing *State v. Carter*, 72 Ohio St.3d 545, 553 (1995).

{¶36} On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*,

10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

{¶37} In this case, Brown was convicted of domestic violence in violation of R.C. 2919.25(A). R.C. 2919.25(A) provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Physical harm to persons" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶38} As used in R.C. 2919.25(A), "family or household member" includes "a person living as a spouse * * * of the offender" who "is residing or has resided with the offender." R.C. 2919.25(F)(1)(a)(i). A "person living as a spouse" includes a person who is "cohabiting with the offender" or who "otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2). "The offense of domestic violence, as expressed in [R.C. 2919.25(F)(1)(a)] * * *, arises out of the relationship

of the parties rather than their exact living circumstances." *State v. Williams*, 79 Ohio St.3d 459 (1997), paragraph one of the syllabus.

{¶39} "The Supreme Court of Ohio has defined '"cohabitation" to include two essential elements: (1) the sharing of familial or financial responsibilities and (2) consortium.'" *State v. Douglas*, 3d Dist. Marion Nos. 9-18-19 and 9-18-20, 2019-Ohio-2067, ¶ 18, quoting *State v. Eberly*, 3d Dist. Wyandot No. 16-04-03, 2004-Ohio-3026, ¶ 21, citing *Williams* at 465.

> Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, [or] commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

*Williams* at 465. "'The burden of establishing cohabitation is not substantial.'" *State v. White*, 2d Dist. Montgomery No. 25792, 2014-Ohio-1446, ¶ 14, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 73 (2d Dist.2004).

{¶40} In addition to the evidence referenced in our analysis of Brown's first assignment of error, the following evidence was presented at Brown's trial.

Patrolman Fried was the State's first witness. In addition to testifying about Fuqua's statements, Patrolman Fried testified that after calling an ambulance to tend to Fuqua's injuries, the focus of the investigation shifted to trying to locate Brown. (Dec. 17-18, 2018 Tr. at 36). He stated that he learned from Fuqua that the alleged incident had taken place in an apartment on Brower Road in Lima, Ohio and that two patrol officers were directed to go to the apartment "to check and see if [Brown] * * * returned and then also to * * * look at potential evidence because [Fuqua] stated there was blood all over the apartment." (*Id.* at 39). Patrolman Fried testified that he eventually drove to the apartment to assist in the investigation, at which time he took a picture of a dent in a wall of the apartment allegedly caused when Brown threw Fuqua's cell phone against the wall. (*Id.* at 42); (State's Ex. 6).

{¶41} Patrolman Fried also identified State's Exhibit 4 as a photograph he took of Fuqua on the day on the incident. (Dec. 17-18, 2018 Tr. at 41-42); (State's Ex. 4). Patrolman Fried testified that State's Exhibit 4 accurately depicted the way that Fuqua looked on December 16, 2017. (Dec. 17-18, 2018 Tr. at 42). In State's Exhibit 4, dried and drying blood is visible around Fuqua's mouth and on her lips and chin. (State's Ex. 4).

{¶42} On cross-examination, Patrolman Fried testified that he did not personally witness any violence between Fuqua and Brown and that Fuqua never indicated that Brown lived with her in the apartment on Brower Road. (Dec. 17-18,

-24-

2018 Tr. at 44-45). Patrolman Fried further testified that Fuqua spoke to him a few months after the alleged incident and that she gave him a letter "stating that the report [she made] was false." (*Id.* at 46). Patrolman Fried identified Defendant's Exhibit A as a copy of the letter Fuqua gave him. (*Id.*); (Defendant's Ex. A). In the letter, Fuqua writes, "A report was made by Officer Nathan Fried and this report was false. It states that 'I said I was thrown to the ground on my stomach then punched in the back and in the face.' That's not true. I was never punched. I made it clear that I was never hit with a closed fist." (Defendant's Ex. A). Patrolman Fried characterized Fuqua's letter as an attempt to recant her previous statements. (Dec. 17-18, 2018 Tr. at 47).

{¶43} Next, Fuqua was called as the court's witness pursuant to Evid.R. 614(A). She was first examined by the State. She testified that on December 16, 2017, she was living in the apartment on Brower Road and that Brown was at her apartment that morning. (*Id.* at 49-50). She stated that Brown spent the night at her apartment, that she woke up to Brown telling her that she received a call on her cell phone from a restricted number, and that "he was talking to the person that called [her using a] blocked [number]." (*Id.* at 67-68). Fuqua testified that Brown "got mad and threw [her cell phone] against the wall." (*Id.* at 68). She stated that the phone broke when it hit the wall and that it made "a little slit" in the wall. (*Id.*).

{¶44} Fuqua testified that after Brown threw her phone, she "started going crazy on him," hit him with her fists, and pushed him. (*Id.* at 70). She stated that Brown "tried to get [her] off of him and then [her] nose * * * started bleeding," so she searched the apartment for some tissues or a rag to stem the bleeding. (*Id.*). Fuqua testified that she then found her phone and that once she found her phone, Brown tried to leave the apartment. (*Id.* at 71). She stated that she followed him in her car before running her car onto the curb. (*Id.*).

{¶45} Fuqua testified that when she first started seeing Brown in 2016, he was living in a house on Scott Street and she was living with her mother on Second Street. (Dec. 17-18, 2018 Tr. at 54-55). She stated that she initially spent some time with Brown but that due to her job at McDonald's, she did "[n]ot really" visit him often. (*Id.* at 54). Fuqua testified that Brown did not spend any time at her mother's house with her and that she would go to his residence to see him. (*Id.* at 55). Fuqua could not recall telling police officers in 2016 that she lived at Brown's house on Scott Street, and she insisted that she was living with her mother. (*Id.* at 56).

{¶46} Fuqua stated that Brown is the father of her daughter, who was born in June 2018. (*Id.* at 57). She testified that until December 16, 2017, she was still seeing Brown. (*Id.* at 58). During their relationship, Brown would help out with Fuqua's son, and Fuqua testified that Brown was good with her son and "bought

him shoes like it was his child." (*Id.* at 58). Fuqua testified that Brown was "kind of" a father figure to her son. (*Id.* at 85). She also testified that Brown would "help out," buy some food and clothing, and help out with her expenses "[if] [she] asked him." (*Id.* at 58-59). She denied ever buying anything for Brown and stated that if "[she] asked him, like [she] needed help, he would help. [It was] the same way [her] family would." (*Id.* at 85). However, Fuqua declined to characterize Brown's relationship with her and her child as a "little mini family." (*Id.* at 58).

{¶47} Fuqua stated that during their relationship, she and Brown liked each other "[f]or the most part" and respected each other. (*Id.* at 59). She testified that they would help each other out with their problems, and she referred to Brown as her "friend." (*Id.*). She also acknowledged that her relationship with Brown was a sexual relationship and that she became pregnant with Brown's child around September 2017. (*Id.* at 59-60).

{¶48} Fuqua stated that she remembered talking to Detective Steven Stechschulte ("Detective Stechschulte") on December 16, 2017 but that she could not remember the entire conversation with him. (Dec. 17-18, 2018 Tr. at 53). Fuqua admitted that she told Detective Stechschulte that Brown hit her when she tried to take her phone back from him, but she testified that Brown did not do that and she only said that because she was mad at Brown. (*Id.* at 71). She also stated that she did not remember telling Patrolman Fried that Brown started hitting her after she

tried to get her phone or that she said in her written statement that Brown got mad about her phone and started hitting her. (*Id.* at 72). She eventually admitted that she said and wrote those things but insisted that "none of that is true * * * [and] [t]hat was [her] speaking out of anger." (*Id.* at 73). She also acknowledged that she said in her statement that Brown slammed her and hit her, but again denied that Brown actually committed those acts. (*Id.* at 73-74). She testified that she could not remember telling medical personnel at St. Rita's that Brown hit her or slammed her. (*Id.* at 74).

{¶49} Fuqua stated that everything she told Patrolman Fried and Detective Stechschulte about being struck or slammed to the ground by Brown was false and that she said those things out of anger at Brown. (*Id.* at 74-75). She testified that she "came up there multiple times trying to change it like a month after and nobody would change nothing that I said. I said everything out of anger. Nobody would change nothing that I said." (*Id.* at 75). She explained that she was angry and trying to make Brown look bad. (*Id.* at 78). When talking about Defendant's Exhibit A, she testified that the letter was meant to explain that Brown never threw her to the ground, punched her in the face, or punched her in the back. (*Id.* at 76). When asked to explain how her nose was bloodied, she stated that it happened when Brown "pushed" her face to get her off of him while she was "going crazy on him." (*Id.* at 76-77). Fuqua stated that the cause of the nosebleed was not a strike with an open

hand. (*Id.* at 76). Finally, she stated that "[m]ost of the stuff [she] said was lies," including statements she made to medical personnel, and that Brown never hit her. (*Id.* at 82).

**{¶50}** When examined by Brown's trial counsel, Fuqua stated that she was "furious" with Brown for breaking her phone and angry that her car had been damaged during her pursuit of Brown. (*Id.* at 85). She reiterated that she was just making things up when she spoke to police officers and medical personnel. (*Id.* at 86). She also testified that she received the bloody nose when Brown pushed against her face with an open palm to get her off of him. (*Id.*). She reiterated that Brown never beat her or threw her to the ground, and she pointed to the fact that she did not have any bruises. (*Id.* at 96-97). Fuqua stated that the only thing that happened was the bloody nose, and she said she often experiences bloody noses. (*Id.* at 97).

**{¶51}** She testified that she was not living with Brown on December 16, 2017. (Dec. 17-18, 2018 Tr. at 88-89). Fuqua stated that although she and Brown would occasionally spend the night at each other's houses during their relationship, they never lived together. (*Id.* at 89-90). She testified that she and Brown did "[n]ot really" share financial responsibilities. (*Id.* at 95). She agreed with Brown's trial counsel's assessment that she would occasionally ask Brown to lend her some money when she "found [herself] in a bind." (*Id.*). She stated that Brown would usually give her money if she asked but that they were not splitting their bills. (*Id.*).

According to Fuqua, there was no regular payment from Brown to her to cover expenses. (*Id.*).

{¶52} Fuqua testified that she went "almost every day" to the police station to try to change her report of what happened to her on December 16, 2017 but that she was largely unsuccessful. (*Id.* at 92-93). She also referenced Defendant's Exhibit B, a letter addressed to a judge of the Allen County Court of Common Pleas, in which she wrote that "some of the things [she] said to the police was false and exaggerated and [she] tried to notify the police numerous times before the case got any further." (*Id.* at 94). Further, Fuqua writes in Defendant's Exhibit B that she "said those things out of anger" and that Brown "is paying for something he didn't do." (Defendant's Ex. B).

{¶53} Following Fuqua's testimony, Patrolman Chad Kunkleman ("Patrolman Kunkleman") of the Lima Police Department testified that on the morning of December 16, 2017 he responded to Patrolman Fried's call for assistance with the investigation into Fuqua's traffic accident. (Dec. 17-18, 2018 Tr. at 106-107). He stated that when he arrived at the scene, Patrolman Fried asked him to drive to the Brower Road apartments to take pictures. (*Id.* at 107). Patrolman Kunkleman testified that when he arrived at Fuqua's apartment, he opened the door and observed blood on the floor. (*Id.* at 108). According to Patrolman Kunkleman, there was blood right inside the entry door, "blood all through the kitchen," "blood

* * * going all the way down the hallway and into the bathroom," and "[b]lood on the floor inside the bathroom." (*Id.* at 109-111). He identified State's Exhibits 7 through 14 as photographs that accurately depicted the apartment as he found it on December 16, 2017. (*Id.* at 111); (State's Exs. 7, 8, 9, 10, 11, 12, 13, 14).

{¶54} On cross-examination, Patrolman Kunkleman testified that the blood he observed inside the apartment "could be" consistent with a bloody nose and that he did not observe any violence between Fuqua and Brown. (Dec. 17-18, 2018 Tr. at 112). He also stated that he never spoke to Fuqua or Brown. (*Id.*).

{¶55} Norris testified next. On cross-examination, Norris was questioned about State's Exhibit 15. Norris acknowledged that one statement in Fuqua's medical record, in which she stated that her stomach was starting to hurt, contradicted her later denial of any abdominal or pelvic pain. (*Id.* at 129). However, Norris stated that such contradictions are "not uncommon at all with patients" and that patients will "tell a nurse one thing and tell a physician another." (*Id.*). On redirect examination, Norris stated that it was possible that Fuqua's abdominal pain had subsided by the time she spoke to the physician. (*Id.* at 130).

{¶56} The State's final witness was Detective Stechschulte. Detective Stechschulte testified that he spoke with Fuqua at St. Rita's, where he recorded their conversation. (*Id.* at 134). He testified that he observed Fuqua's trial testimony and that Fuqua's trial testimony was in contradiction "on multiple points" to the

statements she made to him at St. Rita's. (*Id.*). At that point, a video recording of Fuqua's interview with Detective Stechschulte was played for the jury, without objection, for the purposes of impeaching Fuqua's trial testimony. (*Id.* at 135). The video contradicts much of Fuqua's in-court testimony. After the video was played, the trial court instructed the jury to consider the video for impeachment purposes only. (*Id.* at 137).

{¶57} Detective Stechschulte testified that during the course of his investigation, he "receive[d] information that indicated that she stayed there from somewhere around July of 2016 all the way up until October of 2017 that she had been living down there. [He] also went through [their] in-house system to try to locate reports that would corroborate that claim that she had been staying down there at that time." (Dec. 17-18, 2018 Tr. at 138). From context, it appears that Detective Stechschulte was testifying that records indicated that Fuqua had been residing at Brown's residence. (*See id.*). He stated that he was able to locate a couple of complaints that listed Fuqua's address as 633 South Scott Street. (*Id.*). He testified that these reports were made at various times of the day. (*Id.* at 138-139).

{¶58} On cross-examination, Detective Stechschulte explained that his examination of police records indicated that Fuqua had lived at the Scott Street address for a year and a couple months. (*Id.* at 149-150). He stated that Fuqua had given her address as 633 South Scott Street on at least two occasions and that

although the police did not thoroughly verify whether she was actually living there, some evidence was consistent with her living at that address. (*Id.* at 150). Finally, he indicated that one of the calls came into the police station at approximately 1:30 a.m. and that he believed that indicated that she was living there. (*Id.*).

{¶59} After the State rested its case, Brown offered the testimony of two witnesses. Brown's first witness, Dianiqua Polojac ("Polojac"), who is Fuqua's first cousin, testified that she has a close relationship with Fuqua and that they see each other on a regular basis. (*Id.* at 164). She testified that she was aware of where Fuqua had been living in the previous years, and she stated that Fuqua had lived in the Brower Road apartments, on Wayne Street, and with her mother on Second Street. (*Id.*). She stated that Fuqua lived with her mother before moving to the Brower Road apartments and that she lived with her mother for approximately ten years before moving to the Brower Road apartments. (*Id.* at 165). Polojac testified that Fuqua never lived on Scott Street. (*Id.* at 165). She stated that Fuqua would occasionally stay nights at her house or at Brown's house but "she never lived anywhere else but her mom's and her own place." (*Id.* at 166). Polojac stated that, as far as she knew, Fuqua never lived with Brown. (*Id.*). She testified that she had been to Brown's house and that it did not look like Fuqua was living there because "[s]he didn't have any clothes or anything there. When she left she went home to her mom's to change clothes and get the things she needed." (*Id.*).

{¶60} Brown's final witness was Danetta Robinson ("Robinson"), Fuqua's cousin and Polojac's sister. (Dec. 17-18, 2018 Tr. at 174). She testified that over the previous years, Fuqua lived in the Brower Road apartments and with her mother on Second Street. (*Id.* at 174-175). She stated that, to her knowledge, Fuqua never lived with Brown. (*Id.* at 175). She stated that based on her visits to the Brower Road apartments and to Fuqua's mother's house, Fuqua definitely lived in both of those residences. (*Id.* at 175-176). Robinson testified that she had been to Brown's house, and she said that although Fuqua would be at Brown's house, "she wasn't living there." (*Id.* at 176). She did not see any signs that Fuqua was living at Brown's house. (*Id.*).

{¶61} On cross-examination, Robinson testified that Brown lived on Scott Street for many years, including the years immediately preceding December 16, 2017. (*Id.* at 178). She stated that she was often at Brown's house on Scott Street and that Fuqua was also at Brown's house "[m]ost of the time" that she would be visiting. (*Id.* at 179). She remarked that it was "[p]robably not" uncommon for Fuqua to stay the night at Brown's house. Robinson testified that although she had been to Fuqua's Brower Road apartment on many occasions, she never saw Brown at Fuqua's apartment. (*Id.*). She could not say whether Brown ever stayed the night at Fuqua's apartment. (*Id.*).

**{¶62}** Brown advances three separate arguments to support his claim that the foregoing evidence is insufficient to sustain his conviction and that this evidence weighs against his conviction. First, he argues that his conviction is not supported by sufficient evidence because the only evidence supporting that he assaulted Fuqua is hearsay found in Patrolman Fried's testimony, Norris's testimony, and State's Exhibit 15, all of which he insists is inadmissible hearsay. (Appellant's Brief at 12-14, 16). Brown claims that, in light of Fuqua's testimony that he did not assault her on December 16, 2017 and the alleged inadmissibility of Patrolman Fried's and Norris's testimonies and State's Exhibit 15, the State did not present evidence sufficient to prove every element of the offense of domestic violence. (*Id.* at 13). However, we have already concluded that most of Fuqua's statements contained in Patrolman Fried's and Norris's testimonies and in State's Exhibit 15, specifically those regarding the details of the assault and Fuqua's identification of Brown as her assailant, constitute admissible hearsay. Therefore, to the extent that Brown argues that his conviction is not supported by sufficient evidence because it is based on inadmissible hearsay, we reject that argument.

**{¶63}** Next, Brown argues that the jury clearly lost its way when it determined that Fuqua was a "family or household member" as defined by R.C. 2919.25(F)(1). (Appellant's Brief at 15). He notes that both of his witnesses "testified that Ms. Fuqua did not reside with [him], only that [Fuqua] would stay

there on occasion." (*Id.*). Brown also observes that Fuqua "herself testified that she did not reside with [him], [that] they did not share household expenses or otherwise, but he would occasionally help her out if she asked him." (*Id.*). Stated differently, Brown argues that Fuqua was not a "person living as a spouse," and therefore not a "family or household member," because the evidence does not demonstrate that he and Fuqua were cohabiting or had cohabited.

{¶64} Although somewhat of a close question, we conclude that the State presented evidence sufficient to prove beyond a reasonable doubt that Fuqua and Brown were or had been cohabiting and that the evidence weighs in favor of this conclusion. First, the evidence clearly establishes consortium. Fuqua testified that her relationship with Brown was sexual in nature and that they shared a child together. Furthermore, Fuqua testified that during their relationship, she and Brown liked each other, respected each other, and would help each other with their problems. She also referred to Brown as her friend. This evidence demonstrates that Brown and Fuqua had conjugal relations and that their relationship involved mutual respect, friendship, and aid of each other. *See Williams*, 79 Ohio St.3d at 465. Thus, there is ample evidence of consortium. *See id.*

{¶65} With respect to whether Brown and Fuqua shared familial or financial responsibilities, most, if not all, of the evidence relating to shared responsibilities came from Fuqua's testimony. Fuqua testified that Brown would usually provide

her with money and help her out with expenses if she asked him, that he bought food and clothing for her and her son, and that he would help her out "the same way [her] family would." (Dec. 17-18, 2018 Tr. at 85). However, Fuqua denied that she ever bought anything for Brown, and she testified that she and Brown did "[n]ot really" share financial responsibilities, that they did not split their bills, and that Brown did not provide her with regular payments to cover expenses. (*Id.* at 95).

{¶66} Admittedly, the financial arrangement between Brown and Fuqua was not typical of cohabiting partners. In many cases where a couple was found to have been cohabiting, the couple either commingled their assets or both partners contributed to paying for things such as housing, food, and utilities. Yet, this court and others have found shared familial or financial responsibilities in circumstances where one partner was entirely responsible for supporting the other or where financial assistance flowed solely from one partner to the other without reciprocation. *State v. Edwards*, 9th Dist. Summit No. 25137, 2010-Ohio-6496, ¶ 14-15, 19, 26 (concluding that the trial court's determination that the defendant and victim cohabited was not against the weight of the evidence where the victim gave the defendant money and bought things for the defendant's children but the defendant did not assist with paying bills or otherwise provide financial support to the victim); *State v. Pash*, 3d Dist. Mercer No. 10-09-13, 2010-Ohio-1267, ¶ 11 (concluding that a couple shared familial or financial responsibilities where the

victim fully supported the defendant during the three-month period that they lived together and paid for all household expenses in addition to the defendant's personal expenses); *State v. Boldin*, 11th Dist. Geauga No. 2007-G-2808, 2008-Ohio-6408, ¶ 52 (where the defendant testified that the victim paid for groceries and utilities, did all of the household chores, and handled the finances, there was sufficient evidence that the couple shared familial or financial responsibilities). *But see State v. Cobb*, 153 Ohio App.3d 541, 2003-Ohio-3821, ¶ 5-6 (1st Dist.) (where the defendant provided the victim with one month's rent and, on occasion, gave her money for her telephone bill, groceries, and license plates, there was "[a]t most, * * * a sporadic provision of money" insufficient to show a sharing of familial or financial responsibilities). Furthermore, nothing in *Williams* mandates that the provisions for food, shelter, utilities, clothing, or other expenses be made frequently or at regular intervals. While a one-time payment or a few random, isolated payments from one partner to the other might not suffice to show that the couple shared familial or financial responsibilities, in situations where one partner consistently provides the other partner with money for necessaries at the other partner's request, we see no reason why such an arrangement cannot qualify as the sharing of familial or financial responsibilities.

{¶67} With this in mind, we conclude both that there was sufficient evidence presented that Brown and Fuqua shared familial or financial responsibilities and that

the evidence weighs in favor of this conclusion. Although Fuqua's testimony establishes that she and Brown did not commingle assets or share expenses, that she did not buy anything for Brown, and that Brown did not give her money in periodic installments, Fuqua's testimony does demonstrate that whenever she asked Brown for assistance, Brown would typically oblige. According to Fuqua, the money she received from Brown would then be directed toward paying for her basic needs and her son's basic needs. Apart from the financial assistance Brown provided to Fuqua, the record also reflects that Brown would "help out" with Fuqua's son and that Brown was something of a father figure to the boy. Therefore, while this case approaches the limit of the evidence that will suffice to show that a couple shared familial or financial responsibilities, we conclude that the evidence presented was nonetheless adequate to prove beyond a reasonable doubt that Brown and Fuqua shared familial or financial responsibilities. Moreover, as Fuqua's account of Brown's contributions was not contradicted by other evidence, we also conclude that the evidence weighs in favor of a finding that Brown and Fuqua shared familial or financial responsibilities.

{¶68} To summarize, sufficient evidence was presented to prove beyond a reasonable doubt that Brown and Fuqua shared familial or financial responsibilities and had consortium. Furthermore, the evidence weighs in favor of finding that Brown and Fuqua shared familial or financial responsibilities and had consortium.

Accordingly, the evidence establishes that Brown and Fuqua were cohabiting or had been cohabiting within the relevant statutory time period. Although the bulk of the evidence supports that Brown and Fuqua maintained separate residences, the Supreme Court of Ohio has interpreted R.C. 2919.25 "broadly to include those who did not live with the offender but who also deserved protection under the statute based on their relationship with the offender." *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, ¶ 14, citing *Williams*, 79 Ohio St.3d at 464. Given the evidence of Brown and Fuqua's cohabitation, Fuqua is a person deserving of R.C. 2919.25's protections. Therefore, we conclude that there is sufficient evidence to support a finding that Fuqua is Brown's "family or household member" and that the jury did not clearly lose its way by reaching such a finding.

{¶69} Finally, we consider Brown's third argument for overturning his conviction, in which he argues that the jury clearly lost its way when it disregarded Fuqua's trial testimony in favor of Fuqua's out-of-court statements. Brown argues that Fuqua's in-court repudiation of her earlier statements in which she claimed that he attacked her and her recantation letters outweigh any other evidence suggesting that he assaulted her. (*See* Appellant's Reply Brief at 4-5). Moreover, Brown claims that the State improperly impeached Fuqua's testimony with the video recording of her interview with Detective Stechschulte. (*Id.* at 6). Brown maintains that "[i]t is apparent that the State believed that an appropriate way to have otherwise

inadmissible evidence admitted * * * was to have the Court call [Fuqua] because the truth was inconsistent with the State's position." (*Id.*). He argues that the State's approach to Fuqua's testimony was "essentially just an attempt at circumventing Evid.R. 607[,] * * * not proper pursuant to Evid.R. 613," and resulted in the erroneous admission of the recorded interview as substantive evidence of his guilt. (*Id.* at 6, 8-9).

{¶70} Brown's arguments are without merit. First, with regard to the State's use of the recorded interview, we question whether it was appropriate for the trial court to admit the video recording for purposes of impeaching Fuqua's testimony. In her testimony, Fuqua admitted that she had previously made inconsistent statements to Detective Stechschulte, and she attempted to explain why she made the prior inconsistent statements. Fuqua's acknowledgement of her prior inconsistent statements casts some doubt on the admissibility of the recorded interview for impeachment purposes, and at the very least, her recognition of the prior statements likely made the admission of the recorded interview unnecessary. *See State v. Spaulding*, 6th Dist. Sandusky No. S-16-028, 2017-Ohio-7993, ¶ 16 ("If a witness admits making a conflicting statement, there is no need for extrinsic evidence."), citing *State v. Adams*, 9th Dist. Lorain No. 15CA010868, 2017-Ohio-1178, ¶ 18; *State v. Ferguson*, 10th Dist. Franklin No. 12AP-1003, 2013-Ohio-4798, ¶ 15 ("If a witness admits having made the contradictory statements, however, then

extrinsic evidence of the prior inconsistent statement is not admissible."), citing *In re M.E.G.*, 10th Dist. Franklin No. 06AP-1256, 2007-Ohio-4308 and *State v. Hill*, 2d Dist. Montgomery No. 20028, 2004-Ohio-2048, ¶ 40.

**{¶71}** Nevertheless, we do not believe that the admission of the recorded interview for purposes of impeachment altered the balance of the evidence against Brown. The record reflects that it was the State, rather than Brown's trial counsel, that asked the trial court to issue an instruction to the jury concerning the recorded interview. (Dec. 17-18, 2018 Tr. at 136). In response, the trial court instructed the jury that the recorded interview was not to be considered "for the truth of what was said during that interview" and that it was offered only for purposes of determining whether Fuqua's trial testimony was credible. (*Id.* at 137). Because "[t]he jury is presumed to follow the trial court's instructions" and there is no indication in the record that the jury disregarded this instruction, we have little concern that the jury considered the recorded interview as substantive evidence against Brown. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 103, citing *State v. Loza*, 71 Ohio St.3d 61, 75 (1994). Furthermore, to the extent that the jury might have improperly considered the recorded interview as substantive evidence, we note that much of what Fuqua said in the interview had already been presented to the jury through other admissible evidence.

**{¶72}** Lastly, we consider whether the jury clearly lost its way by relying on Fuqua's out-of-court statements to find that Brown committed the offense of domestic violence instead of acquitting Brown on the basis of Fuqua's trial testimony that Brown did not assault her. After reviewing the record, we cannot conclude that the jury clearly lost its way by discounting Fuqua's trial testimony about the events of the morning of December 16, 2017. At trial, Fuqua acknowledged that she told investigators and medical professionals that Brown assaulted her but she claimed that she had lied to all of these individuals because she was angry with Brown for damaging her cell phone. Furthermore, Fuqua testified concerning all of the efforts she undertook to recant her allegations against Brown. Thus, the jury was well aware of Fuqua's explanations for her prior statements accusing Brown of domestic violence and her many efforts to retract her accusations. The jury was also aware that Fuqua was insisting on a different version of the events of December 16, 2017—a version in which Brown never hit her or threw her to the ground and in which her nose started bleeding only after she went after Brown for throwing her cell phone and Brown pressed against her face in an effort to get her off of him. Yet, in finding that Brown knowingly caused or attempted to cause Fuqua physical harm, the jury evidently found that Fuqua's in-court account of the events of December 16, 2017 was not believable. "This court will not substitute its judgment for that of the trier of facts on the issue of witness

credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Griffith*, 2d Dist. Montgomery No. 26451, 2015-Ohio-4112, ¶ 28, citing *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). On this record, specifically in light of Fuqua's multiple prior statements that Brown assaulted her and the fact that these statements were consistent with each other, it is not "patently apparent" that the jury lost its way by disregarding Fuqua's in-court account.

{¶73} When Fuqua's trial testimony is discounted, the evidence weighs decisively in favor of a finding that Brown committed the offense of domestic violence. Fuqua's out-of-court statements to Patrolman Fried and to medical personnel at St. Rita's establish that Fuqua was physically assaulted, that Brown was her assailant, and that Brown knowingly caused her physical harm. In addition, numerous photographs depict blood on Fuqua's face and spread throughout her apartment; these photographs provide further support for a finding that Fuqua sustained physical harm. Moreover, as discussed above, the evidence weighs in favor of a finding that Fuqua is Brown's "family or household member."

{¶74} Therefore, we conclude that the State presented sufficient evidence to support Brown's domestic-violence conviction and that the trial court did not err by denying Brown's Crim.R. 29 motion. Furthermore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we

cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Brown's domestic-violence conviction must be reversed.

{¶75} Brown's second and third assignments of error are overruled.

### Assignment of Error No. IV

**Defendant-appellant was denied the right to effective assistance of counsel in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

{¶76} In his fourth assignment of error, Brown argues that he was denied his right to effective assistance of counsel as provided for by the United States Constitution and by the Ohio Constitution. Specifically, Brown argues that his trial counsel was ineffective for failing to object to the admission of "several inadmissible hearsay statements in the testimony of every witness presented during the State's case-in-chief, including Patrolman Fried, Ronda Norris, and Detective Stechschulte." (Appellant's Brief at 18).

{¶77} "In criminal proceedings, a defendant has the right to effective assistance of counsel under both the United States and Ohio Constitutions." *State v. Evick*, 12th Dist. Clinton No. CA2019-05-010, 2020-Ohio-3072, ¶ 45. A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct.

2052 (1984). In order to show counsel's conduct was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show that counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *State v. Lytle*, 48 Ohio St.2d 391, 396 (1976).

{¶78} Prejudice results when "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Bradley* at 142, quoting *Strickland* at 694. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.*, quoting *Strickland* at 694.

{¶79} After reviewing the record, we conclude that Brown has failed to establish that he received ineffective assistance of counsel. First, with respect to the hearsay statements contained in Patrolman Fried's testimony, we previously concluded that such statements are admissible as excited utterances under Evid.R.

803(2). "'A defense counsel's failure to object is not ineffective assistance of counsel if the evidence is admissible.' As the Supreme Court of Ohio stated, "'Counsel is certainly not deficient for failing to raise a meritless issue."'" *State v. Carter*, 8th Dist. Cuyahoga No. 104874, 2018-Ohio-2238, ¶ 47, quoting *State v. Jackson*, 8th Dist. Cuyahoga No. 86105, 2006-Ohio-174, ¶ 87, quoting *State v. Taylor*, 78 Ohio St.3d 15, 31 (1997). Consequently, Brown's trial counsel's handling of Patrolman Fried's testimony about Fuqua's statements was neither deficient nor unreasonable.

{¶80} Moreover, even assuming that Brown's trial counsel performed deficiently by failing to object to the hearsay in Norris's testimony, Brown has not demonstrated that he was prejudiced by his trial counsel's performance. As discussed under Brown's first assignment of error, the most incriminating aspect of Norris's testimony was likely when she read from Fuqua's medical records. Given that Fuqua's medical records are admissible and that Fuqua's statements within those records are either admissible under Evid.R. 803(4) or also covered by other admissible evidence, there is not a reasonable probability that the outcome of Brown's trial would have been different had his trial counsel objected to this part of Norris's testimony. In addition, Brown has offered no argument regarding how his trial counsel's failure to object to the other hearsay in Norris's testimony, which were Fuqua's statements about not going back home to Brown and about going to

the prosecutor's office to discuss getting a protection order, prejudiced him. In light of the admissible evidence identifying Brown as the perpetrator of an assault against Fuqua, we do not believe that an objection to, and the exclusion of, these out-of-court statements would have materially affected the outcome of Brown's trial.

{¶81} Finally, although Detective Stechschulte's testimony was generally not concerned with Fuqua's out-of-court statements, it did contain some statements that might be described as hearsay. Detective Stechschulte testified that he was on call on December 16, 2017 when he was "alerted * * * that day shift was out on call with [Fuqua] where she alleged that her soon-to-be child's father had assaulted her." (Dec. 17-18, 2018 Tr. at 133). Additionally, Detective Stechschulte stated that he was in contact with Fuqua while Brown was at large and that she would tell him that Brown "was either in Akron, headed to Akron, he was at his sister's, what kind of car he was in." (*Id.* at 141). He also testified that during his interview with Fuqua, he asked her whether she was struck with a closed fist and she responded that "she didn't know; all she [knew was] that he hit her several times and made her nose bleed." (*Id.*).

{¶82} Brown's trial counsel's failure to object to these statements does not constitute ineffective assistance of counsel. Concerning Detective Stechschulte's testimony about being alerted that Fuqua had alleged that Brown assaulted her, it is apparent from context that the statement was not offered for the truth of the matter

asserted. The statement was elicited during a line of questioning in which the State sought to establish when Detective Stechschulte first became involved in the case and what investigatory steps he took after receiving the report of alleged domestic violence. (*See id.* at 133-134). "It is well-established that, where statements are offered into evidence to explain an officer's conduct during the course of investigating a crime, such statements are generally not hearsay." *State v. Humphrey*, 10th Dist. Franklin No. 07AP-837, 2008-Ohio-6302, ¶ 11, citing *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980). Regardless, even if this statement was improperly admitted, the subject matter of this testimony was covered by other admissible evidence, and thus, there is not a reasonable probability that the outcome of Brown's trial would have been different if his trial counsel had objected. Likewise, Brown has failed to show that he was prejudiced by his trial counsel's failure to object to the other potential hearsay contained in Detective Stechschulte's testimony. Some of the information contained in these other out-of-court statements was introduced at Brown's trial through other admissible evidence. Furthermore, to the extent that these out-of-court statements concerned matters not addressed by other admissible evidence, the admission of this evidence did not likely change the outcome of Brown's trial given the admissible hearsay supporting that Brown assaulted Fuqua and the questionable reliability of Fuqua's trial testimony in which

she denied that Brown attacked her. As a result, Brown has failed to demonstrate that he received ineffective assistance of counsel.

{¶83} Brown's fourth assignment of error is overruled.

### Assignment of Error No. V

**The trial court erred in sentencing by not granting defendant-appellant credit for time served pursuant to R.C. § 2949.08.**

{¶84} In his fifth assignment of error, Brown argues that the trial court erred by not granting him jail-time credit. Brown argues that because his jail sentence was imposed as a separate sanction to his community control, rather than as a condition of his community control, the trial court should have awarded him jail-time credit. (Appellant's Brief at 20-21). In its brief, the State indicates that it agrees with Brown that his jail sentence was not imposed as a condition of his community control and suggests that this case "be remanded to the trial court in order for [Brown] to be resentenced in conformity with R.C. 2949.08(C)(1) and awarded proper jail-time credit." (Appellee's Brief at 27, 29-30). Given that our review of the record coincides with the agreement between the parties as to the issue of jail-time credit, this case is remanded to the trial court so that it may calculate the number of days of jail-time credit, if any, to which Brown is entitled and award any such days to Brown.

{¶85} Brown's fifth assignment of error is sustained.

**{¶86}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued with respect to his first, second, third, and fourth assignments of error, we affirm the judgment of the trial court as to those matters. However, having found error prejudicial to the appellant herein in the particulars assigned and argued with respect to his fifth assignment of error, we reverse the judgment of the trial court as to that matter and remand to the trial court for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**SHAW, P.J. and ZIMMERMAN, J., concur.**

**/jlr**