[Cite as *State v. O'Day*, 2024-Ohio-1654.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

DONALD E. O'DAY,

    DEFENDANT-APPELLANT.

CASE NO. 15-22-08

O P I N I O N

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-20-12-161

Judgment Affirmed

Date of Decision:  April 29, 2024

APPEARANCES:

    *Clayton J. Crates* for Appellant

    *Dillon W. Staas, IV* for Appellee

**MILLER, J.**

{¶1} Defendant-appellant, Donald E. O'Day ("O'Day"), appeals the November 29, 2022 judgment of sentence of the Van Wert County Court of Common Pleas. For the reasons that follow, we affirm.

*Background*

{¶2} On January 7, 2021, the Van Wert County Grand Jury indicted O'Day on two counts: Count One of failure to comply with an order or signal of a police officer in violation of R.C. 2921.331(B),(C)(5)(a)(ii), a third-degree felony; and Count Two of vandalism in violation of R.C. 2909.05(C), (E), a fifth-degree felony. At his arraignment on January 11, 2021, O'Day entered pleas of not guilty.

{¶3} On March 14, 2022, O'Day filed a motion seeking to suppress evidence resulting from the stop of the vehicle, his arrest, and the subsequent search of his person and vehicle. Specifically, O'Day argued that the police had no reasonable articulable basis to stop his vehicle. On March 31, 2022, the State filed its response in opposition to O'Day's motion. The parties appeared for a hearing on the motion to suppress where they stipulated to the factual basis for the motion. In a judgment entry filed on May 4, 2022, the trial court denied O'Day's motion to suppress.

{¶4} The State filed a nolle prosequi with respect to Count Two on October 31, 2022. However, on November 7, 2022, the matter proceeded to a jury trial on Count One, the fleeing charge.

{¶5} At trial, Officer Cory Hirschy ("Officer Hirschy"), an officer with the Van Wert City Police Department, testified that on December 22, 2020, he was investigating potential drug activity at the Van Wert Wal-Mart. (Nov. 7, 2022 Tr. at 163-165). Officer Hirschy stated he had reason to believe that O'Day, who Officer Hirschy was familiar with through prior law enforcement interaction, had been involved in drug activity and that O'Day was driving a red Ford Mustang. (*Id.* at 165). As Officer Hirschy searched the area, he located a red Ford Mustang matching the description in the drive-thru line at a McDonald's located next to Wal-Mart. (*Id.* at 166-167). When Officer Hirschy passed the Mustang, he observed the sole occupant of the vehicle was wearing a face mask and hat. (*Id.* at 166-168, 170-171). Accordingly, Officer Hirschy could only see the driver's eyes and ascertain the driver was male. (*Id.* at 168).

{¶6} Officer Hirschy testified that he ran the Mustang's license plate through LEADS, which identified the vehicle as being registered to a male with a name he did not recognize. (*Id.* at 167). Furthermore, the Mustang was registered to an individual with a temporary driver's license, therefore requiring the driver to have an eligible adult in the front passenger seat while driving. (*Id.*).

{¶7} Because the vehicle was further back in the drive-thru line, Officer Hirschy left the area to search for the other vehicle involved in the drug transaction. (*Id.* at 168). When Officer Hirschy returned to the McDonald's parking lot, the red Mustang was no longer in the drive-thru line. (*Id.* at 168-169).

{¶8} Then, Officer Hirschy called Officer Brandi Dershem ("Officer Dershem") and relayed his observations. (Nov. 7, 2022 Tr. at 169). Specifically, Officer Hirschy informed Officer Dershem that he ran O'Day's information through the LEADS database and learned that O'Day's driver's license was suspended. (*Id.*). He also informed Officer Dershem that the vehicle was registered to an individual with a temporary license. (*Id.* at 167, 169).

{¶9} Shortly thereafter, Officer Hirschy heard Officer Dershem communicate over the radio that she had located the vehicle and it fled when she tried to initiate a traffic stop. (*Id.* at 169). The pursuit ultimately led into Woodland Cemetery. When Officer Hirschy arrived at the cemetery, he observed a red Mustang with license plates that matched those he had observed in the McDonald's drive thru crashed on some headstones. (*Id.* at 170). As Officer Hirschy continued into the cemetery, he observed an individual wearing a face mask and hat held at gun point approximately fifty yards north of the disabled vehicle. (*Id.* at 170-171, 183). Officer Hirschy pulled the hat and mask off the subject's head and confirmed the identity of the individual as O'Day. (*Id.* at 172-173).

{¶10} After being advised of his *Miranda* rights, O'Day claimed he had nearly been hit by a car. (*Id.* at 174). When Officer Hirschy explained that he observed the red Mustang and a person wearing a mask in the McDonald's drive-thru line, O'Day became argumentative and asked Officer Hirschy the reason for the stop. (*Id.* at 174-175). However, before Officer Hirschy could explain the

reason for the stop, O'Day opined the purpose of the stop was "to harass me." (*Id.* at 175).

{¶11} Officer Hirschy testified that, to his knowledge, O'Day was the only person in the cemetery other than law enforcement officers. (Nov. 7, 2022 Tr. at 181). When Officer Hirschy searched O'Day's immediate possessions following his arrest, he located O'Day's wallet, which contained suboxone strips. (*Id.* at 184). However, he did not locate the keys to the red Mustang. (*Id.*).

{¶12} Next, Officer Dershem testified that on December 22, 2020, she observed a red Mustang, but she was initially unsure if it was the same vehicle observed by Officer Hirschy. (*Id.* at 189). As Officer Dershem observed the vehicle, she confirmed the red Mustang bore the same license plate Officer Hirschy provided to her. (*Id.* at 190). The sole occupant of the vehicle was wearing a face mask and hat. (*Id.* at 189-190). However, Officer Dershem observed the driver's hand on the steering wheel and ascertained the driver was a white male. (*Id.* at 214).

{¶13} Officer Dershem decided to conduct a traffic stop of the red Mustang on the basis that she had reason to believe that it was involved in drug activity, the license checks of O'Day indicated that his license was suspended, and a check of the registered owner indicated that the owner possessed a temporary permit license. (*Id.* at 192-193). Officer Dershem activated her overhead emergency lights to initiate a traffic stop of the red Mustang. (*Id.* at 193-194). However, the vehicle did not stop. Because it was 4:30 in the afternoon and still light outside, Officer

Dershem "chirped" her emergency siren to get the driver's attention in case the driver did not immediately observe her overhead lights. (*Id.* at 194-195). Still, the driver of the red Mustang did not stop. (*Id.* at 195).

{¶14} Then, Officer Dershem set her emergency siren to sound continuously. (Nov. 7, 2022 Tr. at 195). Yet, the red Mustang did not stop. (*Id.*). Rather, after initially slowing for a stop sign, the vehicle then took off at a high rate of speed in a 25 mile-per-hour zone. (*Id.* at 195-196).

{¶15} As Officer Dershem continued to follow the red Mustang with her overhead lights and emergency siren activated, she observed it proceed through a four-way intersection at a speed of approximately 50 miles per hour in spite of a stop sign and 25 mile-per-hour speed limit. (*Id.* at 197). Officer Dershem continued the pursuit into a residential area, at which time Officer Dershem observed that she was traveling at 75 miles per hour in a 25 mile-per-hour zone and the Mustang was still pulling ahead of her. (*Id.*). Officer Dershem described the area as a "high foot traffic area" that is nearby a park and typically has people bicycling and walking. (*Id.*). However, Officer Dershem did not observe any pedestrians or vehicular traffic in the immediate area, which Officer Dershem described as "very uncharacteristic" given the unseasonably warm weather. (*Id.* at 197-198). Accordingly, Officer Dershem felt that it was unsafe to continue traveling at the high rate of speed through that area and deactivated her emergency lights and sirens. (*Id.* at 198).

{¶16} Officer Dershem continued to observe the red Mustang as it drove through a posted stop sign across the street from the entrance to Woodland Cemetery. (*Id.* at 199). Officer Dershem recalled she "physically cringed" as she witnessed the Mustang continue through the stop sign without stopping because cross-traffic does not stop at the intersection and trees and other obstructions impede the view and render it a "really dangerous intersection." (*Id.* at 199, 215). After clearing the intersection, the Mustang drove left of center and collided with a stop sign at the cemetery exit, snapping the sign off at the base. (*Id.* at 199-200, 215). Officer Dershem assumed that the impact was going to be serious enough to render the vehicle inoperable; however, the vehicle continued into the cemetery and out of Officer Dershem's sight. (*Id.* at 200).

{¶17} Shortly thereafter, Detective Joseph Motycka ("Det. Motycka") radioed that he had an individual at gunpoint in Woodland Cemetary. (Nov. 7, 2022 Tr. at 202). Upon arrival at Det. Motycka's location, Officer Dershem handcuffed the individual and read him his *Miranda* rights before Officer Hirschy removed the suspect's face mask and hat, revealing O'Day. (*Id.* at 202, 204-205).

{¶18} Officer Dershem observed the red Mustang had crashed into some headstones approximately sixty yards from where O'Day was apprehended. (*Id.* at 202-203). Officer Dershem testified that, other than law enforcement officers, she did not observe any other individuals in the cemetery. (*Id.* at 203-204, 216-217). However, Woodland Cemetery, which is open to the public from dawn to dusk, was

open at the time of the incident. (*Id.* at 202). Officer Dershem described the cemetery as a "high pedestrian traffic" area where people would regularly jog, bike, and walk. (*Id.*).

{¶19} On cross-examination, Officer Dershem clarified that her reasons for initiating a traffic stop: (1) there was a reasonable expectation that the vehicle's registered owner, who had a temporary driver's license, was driving the vehicle without an eligible adult in the vehicle and (2) O'Day, whose driver's license was suspended, could not have legally been operating the vehicle. (*Id.* at 209). Officer Dershem testified that, to her knowledge, the red Mustang's keys were not located. (*Id.* at 217-218).

{¶20} Det. Motycka testified that when he entered Woodland Cemetery he observed a man dressed in dark clothing and a face mask not quite running but moving "between a brisk walk and a slow jog." (Nov. 7, 2022 Tr. at 221-222). According to Det. Motycka, although he did not observe O'Day driving the red Mustang, the description of the man he observed traveling by foot in the cemetery was consistent with the description of the driver he heard over the radio. (*Id.* at 225-226). Det. Motcyka ordered the man to stop and the man was subsequently arrested. (*Id.* at 222-223). When the man's face mask was removed, Det. Motcyka identified the man as O'Day. (*Id.* at 224).

{¶21} Officer Staten, who documented the scene at Woodland Cemetery, testified that several of the photographs depicted gaps of no tire tracks which

indicate the vehicle was traveling at a high rate of speed and went off the road and airborne at times. (*Id.* at 236-247). Officer Staten opined the red Mustang would have been traveling "far in excess" of the speed limit inside the cemetery. (*Id.* at 253-254, 256-257). Officer Staten also assisted with an article search, which included using a canine officer to track the path from the vehicle to the area O'Day was apprehended. (*Id.* at 248-250). In his investigation, Officer Staten located a glass pipe used for ingesting narcotics. (*Id.* at 251-252).

{¶22} Finally, the State offered the testimony of Isaiah Garland ("Garland"), the registered owner of the red Mustang. (*Id.* at 260, 262-263). Garland stated that in 2020 he was in a relationship with O'Day's daughter, and he had allowed O'Day to borrow his Mustang beginning in early December 2020. (*Id.* at 263-264). Garland believed O'Day was in possession of the vehicle at the time of the accident. (*Id.* at 263-265). Further, Garland denied driving the red Mustang or being in Van Wert, Ohio on December 22, 2020. (*Id.* at 263, 266).

{¶23} The State rested. (Nov. 7, 2022 Tr. at 267). Then, O'Day made a Crim.R. 29 motion for acquittal, which the trial court denied. (*Id.* at 268-269). O'Day rested without presenting testimony or evidence. (*Id.* at 273).

{¶24} At the conclusion of the trial, the jury found O'Day guilty of failing to comply with an order or signal of a police officer. The jury made the additional finding that O'Day's operation of the Mustang caused a substantial risk of serious physical harm to persons or property.

{¶25} O'Day appeared for sentencing on November 28, 2022 and was sentenced to 36 months in prison. The trial court filed its judgment entry of sentencing the following day.

{¶26} On December 5, 2022, O'Day filed his notice of appeal. He raises four assignments of error.

**First Assignment of Error**

**The trial court committed prejudicial error by denying Appellant's motion to suppress.**

{¶27} In his first assignment of error, O'Day argues that the trial court erred by denying his motion to suppress evidence. Specifically, O'Day argues that law enforcement lacked reasonable suspicion to initiate a traffic stop.

*Standard of Review for a Motion to Suppress*

{¶28} "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. At a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to evaluate the evidence and the credibility of witnesses. *Id. See State v. Carter*, 72 Ohio St.3d 545, 552 (1995). When reviewing a ruling on a motion to suppress, "an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8, citing *State v. Fanning*, 1 Ohio St.3d 19 (1982). With respect to the trial court's conclusions of law, however, our standard of review is de novo, and we must independently

determine whether the facts satisfy the applicable legal standard. *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*Applicable Law and Analysis*

{¶29} The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures * * *." "'The primary purposes of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers in order to "safeguard the privacy and security of individuals against arbitrary [governmental] invasions."'" *State v. Kerr*, 3d Dist. Allen No. 1-17-01, 2017-Ohio-8516, ¶ 12, quoting *State v. Carlson*, 102 Ohio App.3d 585, 592 (9th Dist.1995), quoting *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391 (1979). "'The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.'" *Id.*, quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801 (1991), citing *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793 (1990). "Thus, '[t]he touchstone of the Fourth Amendment is reasonableness.'" *Id.*, quoting *Jimeno* at 250.

{¶30} "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 809-810, 116 S.Ct. 1769 (1996), citing *Prouse* at 653, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556, 96 S.Ct. 3074 (1976), and

*United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574 (1975). Accordingly, "[a]n automobile stop is * * * subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810. An automobile stop based on probable cause that a criminal violation, including a minor traffic violation, has occurred or was occurring "is not unreasonable, and * * * an officer who makes a traffic stop based on probable cause acts in an objectively reasonable manner." *Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996). In this context, "[p]robable cause 'means less than evidence which would justify condemnation,' so that only the 'probability, and not a prima facie showing of criminal activity is the standard of probable cause.'" *State v. Gonzales*, 3d Dist. Seneca Nos. 13-13-31 and 13-13-32, 2014-Ohio-557, ¶ 18, quoting *State v. George*, 45 Ohio St.3d 325, 329 (1989).

**{¶31}** Here, O'Day argues that the stipulated facts do not establish reasonable suspicion to initiate a traffic stop. At the hearing on the motion to suppress, the parties stipulated to the following facts related to the stop of O'Day's vehicle. [1]

> [State]:          [Y]our Honor, I believe * * *, and [counsel] can correct me if I'm wrong, but I believe this is a legal issue. I don't think there's any factual

---

[1] Rather than proceed with an evidentiary hearing on the suppression motion, the parties agreed there was no factual dispute and the facts provided in their respective pleadings would be sufficient for the court to render a decision. Thereafter, the court summarized the stipulation for the record. Additionally, although the trial court gave the defense until April 28, 2022 and the State until May 5, 2022 to respond with further argument, neither party submitted additional replies or argument.

determination that the Court will need to make on that. That can be handled through additional responses and replies with respect to the reasonable suspicion for the stop.

\* \* \*

[Trial court]: Well we need to have a stipulation as to what the basis for the stop was. So, if I read the Motion right, the basis was that there was an informant, who was identified. And identified informant said that he saw a hand-to-hand transaction in the Walmart parking lot, identified two vehicles, the vehicle was seen shortly thereafter at the McDonald's that, I don't know if it's clear in there, but the McDonald's was right next to the Walmart. That there was a 45-minute gap between seeing the vehicle and a person matching the description at the McDonald's, that another officer saw the vehicle that matched, and I believe the plate matched, is that right?

[State]: Yes, Your Honor.

[Trial court]: And that's when that Officer initiated the stop. Is that right?

[State]: Yes, Your Honor.

[Trial counsel]: Yes.

[Trial court]: So, \* \* \* are you stipulating to that \* \* \*?

[Trial counsel]: I am, Your Honor.

[Trial court]: Because we have some factual basis to evaluate the reasonableness for the stop.

[State]: I will add that, Your Honor, when running the plates, the owner did not return as Mr. O'Day. The owner returned to someone who had a

-13-

temporary driver's license and required a second adult to be in the car in order to drive legally. Um, and that both Officers, the first Officer then observed the vehicle at the McDonald's parking lot, the second Officer initiated the stop. Those confirmed there was only one occupant of the vehicle. I do believe that's relevant with respect to the question of reasonable suspicion to initiate a stop.

[Trial court]:    Do you agree with that, [trial counsel]?

[Trial counsel]:    Yes, Your Honor.

(Apr. 14, 2022 Tr. at 47-50).

{¶32} Based on the parties' stipulation, the trial court denied O'Day's motion to exclude evidence. The attendant judgment entry provides as follows:

The Defendant has moved to exclude all evidence from an unlawful pursuit of him in his motor vehicle. This request is not supported by any offered legal argument. The Court was not offered nor did not find any cases that suggest the basis of the proposed stop for which the Defendant allegedly fled was deficient or if deficient that deficiency is relevant. The[re] is no offered argument that the Defendant enjoyed a privilege to ignore the signal.

The parties stipulated that the Defendant was operating a car alone that was registered to a person with a restricted license. They also stipulated an identified informant saw the vehicle at a hand-to-hand drug transaction and started a search for the vehicle. These facts give a reasonable suspicion to stop the vehicle. The [Court] Denies the motion.

(Doc. No. 71).

{¶33} O'Day asserts that the facts, as stipulated, did not give reasonable suspicion for the traffic stop. Specifically, O'Day contends that because, at the

-14-

suppression hearing, the trial court, in attempting to restate the parties' stipulation, only specified a "hand-to-hand transaction" rather than a "hand-to-hand *drug* transaction" as the court found in its judgment entry, that the court was assuming facts not in evidence. Additionally, he contends, "there is nothing in the record that indicates that the caller thought there was anything illegal or suspicious about a hand-to-hand transaction occurring in a Walmart parking lot." (Appellant Brief at 10).

{¶34} However, contrary to O'Day's argument, it is evident from the record that although the trial court omitted the portion of the stipulated facts that the hand-to-hand transaction at issue involved drugs, the parties were in agreement that the transaction at issue was, in fact, a *drug* transaction. Notably, both parties, in their briefing to the trial court, referenced a drug transaction. It is evident that, in crafting the stipulation, the trial court referenced the facts presented in O'Day's motion which specified that the informant "called the Van Wert Police Department and stated that he believed he witnessed a drug deal occur." (Doc. No. 64). Accordingly, the nature of the transaction was conceded by O'Day in his briefing and was not a contested issue. Thus, the trial court did not err by referencing a *drug* transaction.

{¶35} O'Day also challenges the reasonable suspicion for the traffic stop because it was based, at least in part, on the basis that the registered owner of the vehicle, who was not O'Day, possessed a temporary driver's license requiring a

licensed driver to be present in the vehicle. O'Day contends that because there was some indication that he was driving the vehicle, rather than the registered owner, the temporary nature of the owner's driver's license was irrelevant to establishing a basis to initiate a traffic stop.

**{¶36}** Regardless, the caller had provided the license plate of the red Mustang he observed participating in the drug transaction, which matched the license plate of the red Mustang that Officer Dershem spotted. Additionally, the State's response to the motion to suppress indicated that Officer Hirshy was aware that O'Day's driver's license was suspended, and as such, if he was driving the vehicle, he was doing so in violation of the law. Accordingly, the record indicates that Officer Dershem had reasonable articulable suspicion to believe that the vehicle was being operated illegally –either by the registered owner who had a temporary license or O'Day whose license was suspended.

**{¶37}** Therefore, the trial court did not err by determining there was lawful cause to initiate a traffic stop of the vehicle. Accordingly, the trial court did not err by denying O'Day's motion to suppress.

**{¶38}** O'Day's first assignment of error is overruled.

**Second Assignment of Error**

**The Trial Court Committed Prejudicial Error by Denying Appellant's Rule 29 Motion.**

**Third Assignment of Error**

**Appellant's Conviction Was Not Supported by Legally Sufficient Evidence.**

**Fourth Assignment of Error**

**Appellant's Conviction Was Against the Manifest Weight of the Evidence.**

{¶39} In his second assignment of error, O'Day argues that the trial court erred by denying his Crim.R. 29 motion for acquittal. In this third assignment of error, O'Day challenges the sufficiency of the evidence supporting his conviction. In his fourth assignment of error, O'Day contends that his conviction was against the manifest weight of the evidence, and therefore, must be reversed.

*Standards for Sufficiency-of-the Evidence, Crim.R. 29,*
*and Manifest Weight Review*

{¶40} Manifest "weight of the evidence and sufficiency of the evidence are clearly different legal concepts." *State v. Thompkins*, 78 Ohio St.3d 380, 389 (1997). Accordingly, we address the sufficiency of the evidence and manifest weight legal concepts individually.

{¶41} Pursuant to Crim.R. 29(A), "[t]he court on motion of a defendant * * *, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * *, if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because the purpose of a Crim.R. 29 motion for acquittal 'is to test the sufficiency of the

evidence presented at trial,' we 'review[ ] a denial of a Crim.R. 29 motion for judgment of acquittal using the same standard that is used to review a sufficiency of the evidence claim.'" (Bracketing in original.) *State v. Brown*, 3d Dist. Allen No. 1-19-61, 2020-Ohio-3614, ¶ 35, quoting *State v. Willis*, 12th Dist. Butler No. CA2009-10-270, 2010-Ohio-4404, ¶ 9. Accordingly, we will address O'Day's challenges to the sufficiency of the evidence and the trial court's denial of the Crim.R. 29 motion together.

**{¶42}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds*, *State v. Smith*, 80 Ohio St.3d 89 (1997). Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

**{¶43}** On the other hand, in determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

*O'Day's Offense*

**{¶44}** We first review the sufficiency of the evidence supporting O'Day's conviction.

**{¶45}** O'Day was convicted of failure to comply with order or signal of police officer in violation of R.C. 2921.331(B), which provides, "[n]o person shall operate a motor vehicle so as willfully to elude or flee a police officer after receiving a visible or audible signal from a police officer to bring the person's motor vehicle

to a stop." R.C. 2921.331(B). The statute provides that "police officer" as used in the statute, "has the same meaning as in section 4511.01 of the Revised Code" in which "police officer" is defined as "every officer authorized to direct or regulate traffic, or to make arrests for violations of traffic regulations." R.C. 2921.331(F)(2); R.C. 4511.01(Z). "Although 'the term "willfully" is not defined in R.C. 2901.22, which is the statutory provision that covers culpable mental states for criminal liability,' 'the 1974 committee comments to R.C. 2901.22' indicate that ""[p]urpose is defined in terms of a specific intention either to cause a certain result, or to engage in conduct of a certain nature regardless of what the offender intends to accomplish through that conduct. 'Purposely' in the new code equates with 'purposely,' 'intentionally,' 'willfully,' or 'deliberately' in the former law.""" *State v. Kreischer*, 3d Dist. Van Wert No. 15-20-09, 2021-Ohio-1235, ¶ 27, quoting *State v. Cole*, 3d Dist. Seneca No. 13-10-30, 2011-Ohio-409, ¶ 22, quoting R.C. 2901.22.

**{¶46}** Additionally, O'Day was charged under R.C. 2921.331(C)(5)(a)(ii), which enhances the offense to a third-degree felony if the trier of fact finds "[t]he operation of the motor vehicle by the offender caused a substantial risk of serious physical harm to persons or property." A ""[s]ubstantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

*Analysis: Sufficiency of Evidence*

-20-

**{¶47}** In his second and third assignments of error, O'Day argues that the State failed to present sufficient evidence to support his conviction. Specifically, O'Day contends that the evidence produced at trial was not sufficient to demonstrate that (1) his actions caused a substantial risk of serious physical harm to persons or property and (2) that O'Day was the driver of the red Mustang. We disagree.

**{¶48}** In support of his argument that insufficient evidence was produced to demonstrate that his actions caused a substantial risk of serious physical harm to persons or property, O'Day relies on Officer Dershem's testimony that she did not observe any vehicular or pedestrian traffic in the area during the pursuit.

**{¶49}** However, Officer Dershem also described the lack of pedestrians or vehicular traffic in the immediate area of the chase as "very uncharacteristic" given the unseasonably warm weather. (Nov. 7, 2022 Tr. at 197-198). Indeed, Officer Dershem perceived the risk of harm to persons to be so great that she terminated her pursuit and deactivated her emergency lights because she believed continuing the pursuit would be "unsafe." (*Id.* at 198). Officer Dershem recalled the red Mustang was pulling ahead of her as she traveled at a speed of 75 miles per hour in a residential area. (*Id.* at 197). "While fortunately it appears no serious physical harm to persons or property did occur, '[i]t is only the strong possibility that harm could occur that creates culpability under R.C. 2921.331(C)(3). It is clear that simply because an offender is fortunate enough not to actually cause harm is of no consequence.'" *State v. Barnhart*, 4th Dist. Athens No. 21CA13, 2023-Ohio-3488,

¶ 24, quoting *State v. Gasioworowski*, 8th Dist. Cuyahoga No. 80000, 2002-Ohio-976, at *3 (Mar. 7, 2001), citing *State v. Semenchuk*, 122 Ohio App.3d 30 (8th Dist.1997). Accordingly, we find O'Day's argument to be without merit.

{¶50} O'Day also alleges that the State did not present sufficient evidence to establish that he was the driver of the red Mustang. In support of this contention, O'Day relies on the statements of several law enforcement officers that the keys to the red Mustang were not located on or around O'Day's person following his arrest. O'Day also argues that "nobody was able to identify [him] driving the vehicle." (Appellant's Brief at 14).

{¶51} "'It is well settled that in order to support a conviction, the evidence must establish beyond a reasonable doubt the identity of the defendant as the person who actually committed the crime at issue.'" *State v. Missler*, 3d Dist. Hardin No. 6-14-06, 2015-Ohio-1076, ¶ 13, quoting *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 27, citing *State v. Collins*, 8th Dist. Cuyahoga No. 98350, 2013-Ohio-488, ¶ 19 and *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. "'[D]irect or circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime.'" *Collins* at ¶ 19, quoting *Lawwill* at ¶ 11. Circumstantial evidence has no less probative value than direct evidence. *State v. Griesheimer*, 10th Dist. Franklin No. 05AP-1039, 2007-Ohio-837, ¶ 26, citing *Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus. *See also State v. Heinish*, 50 Ohio St.3d 231, 238 (1990) ("This

court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.").

{¶52} Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that O'Day was the driver of the red Mustang. The State presented evidence that two law enforcement officers saw an individual wearing a face mask and a hat driving the Mustang. Upon entering Woodland Cemetery, Det. Motycka observed a man wearing a face mask and hat moving briskly through the cemetery near the location of the disabled red Mustang. When the face mask and hat were removed, the individual was identified as O'Day. Moreover, other than law enforcement O'Day was the only person located in the cemetery. Additionally, Officer Staten testified that canine officers followed O'Day's scent from the red Mustang directly to the location where he was apprehended.

{¶53} Although O'Day initially told law enforcement officers at the scene that he was nearly hit by a car, he then became argumentative and asked the reason for the stop, opining that it was to "harass" him. (Nov. 7, 2022 Tr. at 175). Moreover, Garland, the registered owner of the vehicle testified that he loaned his red Mustang to O'Day in early December and, to his knowledge, O'Day was in possession of the vehicle on December 22, 2020.

**{¶54}** Accordingly, we reject O'Day's argument that the State did not produce sufficient evidence to support his conviction.

**{¶55}** O'Day's second and third assignments of error are overruled.

*Analysis: Manifest Weight of Evidence*

**{¶56}** Having determined that sufficient evidence supports O'Day's conviction for failure to comply with order or signal of police officer, we next turn to his fourth assignment of error, wherein he argues that his conviction is against the manifest weight of the evidence. However, in making this manifest-weight argument, O'Day largely duplicates claims he made when challenging the sufficiency of the evidence. O'Day summarily argues that "contradictory evidence" was presented at trial suggesting that O'Day did not operate the red Ford Mustang—namely that law enforcement officers were unable to directly identify him as the driver, the key to the vehicle was not found on O'Day's person, and no personal items relating to O'Day were found in the vehicle. Additionally, O'Day attempts to challenge the finding that his conduct posed a substantial risk of serious harm to persons or properties on the basis that vehicular or pedestrian traffic was not present in the immediate area of the pursuit.

**{¶57}** However, having conducted a review of the record and the evidence in accordance with the standard set forth above, we do not find the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial.

**{¶58}** O'Day's fourth assignment of error is overruled.

*Conclusion*

**{¶59}** For the foregoing reasons, O'Day's assignments of error are overruled. Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Van Wert County Court of Common Pleas.

***Judgment Affirmed***

**WILLAMOWSKI, P.J. and WALDICK, J., concur.**

/tmm